From his home in Indianapolis, Mr. Boryga left anti-Semitic voicemails with the Anti-Defamation League. Each voicemail contained threatening and hateful language targeted at the Jewish people. Under Note 3 of U.S. Sentencing Guidelines, Section 2A, 6.1, grouping is required when the counts involve making a threat to the same victim. This court should vacate Mr. Boryga's sentence and remand for resentencing with an order that the four counts be grouped for two reasons. How many calls did he make? There were eight that were charged. And how, where were the calls? To where or from where? To where? They were all to the Anti-Defamation League. They were to different places in the country, but all to the organization of the ADL. Is there any, is there any, is there any information in the record as to why he was calling different locations of the Anti-Defamation? There's no, there's nothing in the plea agreement or the... No, there was no plea agreement. He pled open and there was nothing in the plea, in any sort of colloquy in the sentencing. But I will say, Your Honor, that in the government sentencing memorandum, it made the point that, quote, all of Mr. Boryga's voicemails contained racist and or anti-Semitic remarks saying that Jewish people should not exist. And then on page two, they also said that Boryga clearly threatens to kill the Jewish people. Additionally, the indictment itself speaks to the broad... Why should we consider the victim to be an entity as to the individuals that he called? Yeah. Well, to be clear, Your Honor, he didn't call individuals, he left voicemails. Well, he expected an individual to listen to the message, right? I mean, you're saying, I mean, he wasn't just, you don't call like IBM and not expect that a human being is going to receive the message, right? Sure. He clearly expected, I mean, the only reason he left a voicemail with this hate on it is because he expected somebody would listen to it. And I asked that question because if he called the Houston chapter eight times, that would tell me that maybe he was reaching out to someone in particular at the Houston chapter. But why was he calling Las Vegas? I don't know what else he called, Dallas and Chicago. He's clearly covering the world or covering the country, right? That's exactly why the victim is the Jewish people writ because there are Jewish people throughout the country. I actually think that Your Honor's hypothetical would go the other way, which is if there was someone in particular he would call, were calling at the Houston office, that would indicate an individual victim as opposed to a victim group. This court's recent decision in Haas spoke to the fact that there can be victim groups. In that case, there were two groups. One group was society and the other group was federal employees who were targeted in posts on a Russian site that was like Facebook. But does Haas go for you or against you? I believe it goes for me. I know that the court ultimately held that there were two different groups. But if you look at the actual language of the threats in Haas, they're quite similar to the threats here. And the court looked specifically at the language of the threats and found on plain error review, it upheld the district court's decision. It found that the threats that use the words fed were part of a group that was targeted, the federal government employees, and the rest of them were targeted at society in general. Here, all the threats use very similar language targeting the Jewish people. Even if he doesn't use the term Jew, for example, he does speak about Nazis, which are clearly related to Jews in general. He speaks about methods of execution that were used during the Holocaust. I think the plain language of the threats themselves makes clear who his target was, as does the indictment, as does the government's sentencing memorandum. Mr. Bacar, I think you make a fair point about the defendant's subjective intent in terms of really conveying hate, expressing a desire to inflict harm on Jewish people generally. But that's one way to look at it. The district court, at least in part, focused on the words that he used when he left the messages, words like you, your, and said, in keeping with Judge Kirsch's observation, knowing that somebody was going to listen to the voicemail, that somebody could have reasonably heard the message as one targeting them as either a member of the Jewish faith or somebody that was working to further the beliefs of Jews. Why isn't that an equally reasonable construction of what happened here? In cases where there has been some sort of interpretation of the word you, it's usually been in the context of a live telephone conversation. So, for example, in the Simmons case, the defendant there spoke directly to the person on the phone and used their name. And the court of appeals there held that that was dispositive in deciding who was the victim. Here, it doesn't make sense when there's this broad language of you that I believe from the plain language of the threats makes clear it's in the plural. If you look at the other words used, for example, the slurs for Jews, it's often in the plural. He refers to women in the plural. He refers to multiple people. And so I don't think a reasonable person listening to the language, especially when Mr. Borga has a very thick Polish accent, would think that it was targeted toward them in particular for any reason other than their faith or ethnicity. I'd also like to draw this court's attention to the grouping rules, the introductory comment, and the policy behind the grouping rules. And in that introductory comment, it says that, quote, convictions on multiple counts do not result in a sentencing enhancement unless they represent additional conduct not otherwise accounted for by the guidelines. In this case, there's no additional conduct not otherwise accounted for by the guidelines. From each of the four counts, Mr. Borga made calls from his home, he left voicemails, to the same organization. All four threats were charged under 875C with the same special finding. Additionally, the guidelines cover all of Mr. Borga's conduct. He received an enhancement under B2A for more than one threat. Note 4 of 2A6.1 permits an upward departure in situations where there's a large number of threats or where there's a prolonged period over which the threats are made. The judge did not decide to give that upward departure and actually instead gave it a downward variance. Additionally, 3A1.1 permits an enhancement when there's a hate crime motivation, which Mr. Borga did receive. And because he received the hate crime enhancement, he therefore was ineligible for the zero point offender reduction, which would have reduced his total offense level by two points. Because of that, sorry, Your Honor. Go ahead. Go ahead and finish. I got a question, but go ahead and finish your thought. Just because of that, his total offense level was 18 when if he didn't receive the enhancements and was able to receive the zero point offender reduction, his total offense level would have been eight with the resulting advisory guidelines range of zero to six months. And he would have been able to simply serve probation instead of having any sort of prison time. Just to say the guidelines really do account for the conduct here. And just because the court below did not decide to do the upward departure, it doesn't mean that the guidelines don't permit that sort of situation. Don't you think the district court, I'm looking right at the language of the voicemails. Don't you think the person that listened to them could have thought, we just got a very threatening message left. And I don't know whether somebody's going to come and try to blow the building up or fire shots through the window. But this ain't good. I agree with Your Honor that the threats are not good. But I would say that just because someone subjectively feels threatened, that doesn't turn them into the victim for the Note two of 3D 1.2 requires that the victim be the person who is primarily affected and doesn't cover indirect or secondary victims. In this case, if it were the case that anybody who felt threatened were the victim, that would mean that there could be endless victims. And that would fly exactly in the face of the introductory comment, which explains that the grouping rules are meant to reduce the effect of the government sentence charging decisions. For example, actually, the victim impact statement from Mr. Vecchione, who is an ADL security officer, goes directly to Your Honor's point. He explained that he was scared because of Mr. Borga's voicemails, but he does not say he's Jewish, nor does he say that this is an unusual thing to happen. He actually says this is something he deals with in the course of his job. The chapel case from the 10th Circuit addresses this directly, where individuals who come across a threatening communication when they're not the intended recipient, but they through the course of, in that case, being a secretary, view the threatening materials, they're an indirect or secondary victim under note two. But if the individual you're referencing is an employee of the ADL, and they are expected to answer the phone, and they do answer the phone, and they threaten the ADL, and that person feels potential harm, yes, it's subjective. But if they had submitted, for example, a victim impact statement, or if they'd been brought to the sentencing hearing and testified before the judge, would that change the calculus? Your Honor, I see that I have only one minute left. I'd like to reserve that time. No, it wouldn't change the calculus because it's the intent, not the subjective intent, but the intent through verifiable indicia, like the indictment or the government sentencing memorandum. If it were the case that anybody who worked in security could become the victim, then every police officer who responds to a scene of a crime could be a victim. And then we'd be in a situation where the government's charging decision dictates how many groups there are, which is exactly what the sentencing guidelines sought to avoid. We're going to give you some rebuttal time. Practical question. Sentence was 24 months. That falls between the two potential guidelines. It does not, Your Honor. He actually got a downward variance. He got a three-month downward variance below the low end of the range. So he's at 24 months. He's at 24 months, yeah, exactly. To finish my thought, it falls between the two guideline ranges, the one that you would have asked for and the one that was given. No, that's not correct, Your Honor. The one that I'm asking for would be 15 to 21 months. It would be a total offense level of 14. So in order for the court to still impose that, it would have to actually vary or depart upwards. And then he did receive a guideline range of 24 and higher. No, his guidelines range was 27 to 33. I apologize. The judge varied down three. And so if the court were to group all four in order for Mr. Borger to receive the same sentence, there would have to be an upward variance of three. But the 24 sentence falls between the 21 and the 27. It falls between the high end of what I'm asking for and the low end of what was below. Yes. The sentencing occurred on July 23rd of 24. Yes. Was he remanded or did he report? I believe that he remanded. He was remanded right away? Yes. So he's about 11 months into his sentence? Yes. Okay. I'm not 100% positive about that. I could double check, but I believe he was immediately remanded. All right. Thank you. We'll give you some rebuttal time. Thank you. Mr. Reitz, we'll move to you. May it please the court. Brian Reitz for the United States. This court has said that threats to multiple locations implicate multiple victims. Here, Mr. Borriga called four ADL branches in different cities threatening to kill Jewish people, thereby ensuring that at least four people would hear his threats. Those people, in fact, as in the record, felt afraid for their safety. Mr. Borriga admitted when he talked to the police that his intent was to make the people that heard his calls afraid. And that situation, four groups were appropriate. I do want to address a couple of things that Mr. Borriga said about the number of victims and the possibility that government could control or inflate this. So first, Mr. Borriga said that there could be Well, under 3D1.4, the most units there could be is five groups. So unless Mr. Borriga thinks five is endless, that's not possible here. Similarly, the comment about police officers hearing could be victims, or in his brief, Mr. Borriga mentioned that over the news. This, of course, is tied to counts. You can only get a group if there's a charge and a conviction. Those things wouldn't be convictions, so it's tied to convictions here. The most victims under the guidelines there could be is four. Of course, colloquially, there were, I don't know, a number of victims. Everybody that heard the threats colloquially was a victim, but there only could be four victims under the guidelines. Other than that, if the court has no further questions, we'd be happy to rest on our brief. Thank you very much, Mr. Wright. Mr. Bracar, we'll go back to you now for two minutes of rebuttal. Thank you, Your Honors. I would just like to briefly point out that many of the cases on which the government relied, including the ones speaking to multiple locations, are actually interpretations of 3D1.2b, which require that there be a common criminal objective or a common scheme or plan, and that that interpretation is actually about that prong and not of the common victim prong. And so those cases are really an opposite because they're deciding something completely different from what's at issue here. Similarly, there are two cases that the government cites to that are the Bonner and Simmons decision. Both of those are from the early 90s at a time before 2A6.1 was amended to include the language about mandatory grouping when the counts involve a threat to the same victim. And so those cases are also interpreting language that's no longer applicable to this case. So I just want to make sure the Court's aware of the fact that those are really not at issue here. Additionally, I would just like to finally make the point that the guideline of Note 3 of 2A6.1 doesn't include identical language to 3D1.2. For the guideline grouping under 2A6.1 to occur, it's when the counts, quote, involve making a threat to the same victim. Under 3D1.2, it requires that the counts involve the same victim. So I interpret that to be that for grouping under Note 3, as long as there's a common victim among the counts, grouping is required. On the other hand, for grouping under 3D1.2, there must be uniformity of victims among the counts, based on that language of a threat versus the counts involving the same victim. There are no further questions. The rest on that. Very good. Thank you very much. Thank you, Your Honor. Thanks to both parties. The case will be taken under advisement.